LAW OFFICES OF
JEFFREY LICHTMAN
750 LEXINGTON AVENUE
15TH FLOOR
NEW YORK, NEW YORK 10022
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
RACHEL D. GOLD

PH: (212) 581-1001
FX: (212) 581-4999

March 18, 2016

**BY ECF & HAND DELIVERY**
Hon. Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: <u>United States v. Santellan Maigua</u>, S1 15 CR 822 (DLC)

Dear Judge Cote:

### A. INTRODUCTION

  This letter is submitted on behalf of defendant Christopher Santellan in anticipation of his April 1, 2016 sentencing. With this letter, the defendant respectfully requests a sentence that is "sufficient, but not greater than necessary to comply with the purposes" set forth in 18 U.S.C. § 3553(a)(2) due, in part, to the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The basis for this request is as follows: *first*, this case is unusual in that there exists evidence that the victim participated in the events that led to the defendant's arrest; *second*, Mr. Santellan will suffer additional punishment in that he will be deported to Ecuador after serving his sentence; and *third*, a review of the defendant's life finds that there are many good deeds and the prospects for his rehabilitation are very good.

### B. THE DEFENDANT'S GUILTY PLEA AND RESULTING GUIDELINES RANGE

  On December 29, 2015, Mr. Santellan pleaded guilty pursuant to a plea agreement to a one count Information which charged him with traveling in interstate commerce with the intent to harass and intimidate another person, in violation of 18 U.S.C. § 2261A(1)(B). <u>See</u> December 28, 2015 Plea Agreement ("Plea Agreement") at p. 1. Mr. Santellan faces no statutory minimum and a maximum term of imprisonment of five years. <u>Id.</u>

JEFFREY LICHTMAN
>Hon. Denise L. Cote
>United States District Judge
>March 18, 2016
>Page 2

   As recounted in the Presentence Investigation Report ("PSR"), U.S.S.G. § 2A6.2 applies to the Information, however, because the offense of conviction occurred during the "commission of another criminal offense," namely, kidnapping and unlawful restraint, the Guideline for that offense is applied because it results in a higher offense level. PSR at ¶ 15; U.S.S.G. § 2A6.2(c)(1). Pursuant to § 2A4.1(a), the base offense level for kidnapping is 32, and with no adjustments and three levels subtracted for acceptance of responsibility (§ 3E1.1), the total offense level is 29, carrying an advisory sentencing range in Criminal History Category I of 87 to 108 months imprisonment. PSR at ¶¶ 16-24. Nevertheless, because the statutory maximum sentence of five years is less than the minimum applicable guideline range, Mr. Santellan's guidelines are 60 months imprisonment. PSR at ¶¶ 53; U.S.S.G. § 5G1.1(a).

  C. **OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

   The following objections were filed with the Department of Probation on March 7, 2016. No addendum or supplement to the PSR addressing the objections has yet been issued, and accordingly, they are reproduced here. The government did not make any written objections to the PSR, but alerted the defense to an issue with the time stamps on the telephone records they provided. The below objections have been modified to correct for the time stamp errors.

   PSR at ¶¶ 7-10: Multiple details in the offense conduct section, which focuses on the kidnapping charged in the indictment – a crime to which Mr. Santellan did not admit guilt – are belied by the discovery provided by the Government.

   *First*, despite the PSR's intimations to the contrary, it is clear from a search of the victim's phone that she was not "denied ... access to [it]" (PSR at ¶ 8) for the *entirety* of the 11 hour trip from Queens, New York to Prince George's County, Maryland, and therefore "had no means of communication with friends or family." Id. at ¶ 9. Instead, the provided records reveal that the victim had access to her phone throughout the day, sending text messages (13 messages between 7:42 a.m. and 9:08 a.m.; five messages between 10:33 and 11:35 a.m.; seven messages between 1:00 p.m. and 1:12 p.m.; one message each at 3:30 p.m. and 5:48 p.m.) and viewing Facebook (12:57 p.m., 1:23 p.m., 2:10 p.m. and 2:15 p.m.).

   *Second*, it is apparent that the victim was not held against her will for the entirety of the October 1, 2015 trip from New York to Maryland. See PSR at ¶¶ 8-9. In addition to the above records which indicate that she frequently utilized her own cellular telephone, during her 6:11 p.m. 911 call, she twice warned Mr. Santellan that he needed to immediately leave the area, presumably for his own protection, whispering: "go Chris," and later, "you have to go." These warnings – and the fact that she lied about them to police upon questioning on this topic – are indicative of some mutual participation in the events that transpired on October 1, 2015.

JEFFREY LICHTMAN
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 3

  PSR at ¶ 34: While the domestic violence Mr. Santellan witnessed as a young child between his mother and alcoholic father appeared "normal" due to its frequency, he was certainly not "[un]affected" by it.

  PSR at ¶ 44: Mr. Santellan attended Queensborough Community College, and not Queens College as indicated in the PSR.

  **D. THE DEFENDANT'S BACKGROUND AND THE NATURE OF THE OFFENSE – APPLICATION OF § 3553(a) FACTORS**

  Since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. § 3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs sentencing courts to "impose a sentence" that is "<u>sufficient, but not greater than necessary</u>, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. § 3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1). With these aims in mind, we submit the following for the Court's consideration.

  **i. The Unusual Facts of this Case**

  This is not a typical kidnapping case, and indeed, the defendant did not plead guilty to that charge. Instead, as noted in our objections to the PSR, it is clear from the discovery provided by the government that the victim was not held against her will for the entirety of the October 1, 2015 trip from New York to Maryland. While we do not offer the information below to excuse the defendant's abhorrent conduct, it offers greater context for the crime to which he did plead guilty – traveling in interstate commerce with the intent to harass or intimidate another – and provides mitigating facts that militate in favor of a lenient sentence pursuant to 18 U.S.C. § 3553(a). See, e.g., United States v. Collins, No. 05 Cr. 1193, 2007 WL 1723718, at *6 (S.D.N.Y. June 7, 2007) ("nature and circumstances of [defendant's] involvement militate in favor of the imposition of a non-guideline sentence"); United States v. Behr, No. 03 Cr. 1115, 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) ("In accordance with § 3553(a)(1) and (2), [defendant's] role and involvement in the instant offenses also bears relevance to the appropriate sentence to be imposed").

JEFFREY LICHTMAN
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 4

The Victim's Access to Her Cellphone: As revealed in the government's application for a warrant to search the defendant's cellphone, the victim claimed to investigators that she was "denied ... access to her cellular telephone," and "had no means of communication with friends or family," during the 11 hour trip from New York to Maryland. See October 21, 2015 Affidavit in Support of a Search Warrant Application by FBI SA Sarife Murphy, at ¶ 9(d)-(e). This claim is belied by the phone records turned over by the government which, as described in our objections to the PSR, note that numerous text messages were sent from her phone throughout the day, including at 8:14 a.m. – an hour after she entered Santellan's van – a message to an unknown recipient which read "Pls tell Edison [the victim's boyfriend] what's going on." Additionally, the victim accessed her Facebook account from her cellular phone at 12:57 p.m., 1:23 p.m., 2:10 p.m. and 2:15 p.m. – and during the latter two, utilized the Facebook messaging feature. As the victim's Facebook records were never turned over by the government, it is unclear if any posts were made or messages sent during these periods of use, but certainly there was *access*.

The Victim Warned Santellan to Leave the Area During her 911 Call and Lied About it: In addition to the above records, when the victim called 911 at 6:11 p.m. on October 1, 2015, she twice warned Mr. Santellan that he needed to immediately leave the area, presumably to escape capture by police. See October 1, 2015 911 Call Transcript, attached as Exhibit A, at T 1, 3-4. First, in a clear whisper, she stated "go Chris," and later, she again whispered "you have to go." Id. When questioned by the 911 operator, the victim lied and denied that she had said anything or that anyone was with her – and later, she claimed to agents that she had lied to the operator "for fear that the defendant would *realize she had called the police*." See December 4, 2015 Discovery Letter of AUSA Frank Balsamello, attached as Exhibit B (emphasis supplied), at pp. 1-2. A review of the transcript of the 911 call reveals this explanation to be a complete falsehood. During the time between these two whispered warnings to the defendant, the victim gave a full account of her abduction, describes Mr. Santellan's appearance and gives his name. Anyone with the victim and close enough to hear her whisper would have obviously concluded that she had called the police. Regardless, it would be nonsensical to whisper to one's *abductor* for fear that he would overhear that a 911 call was in progress – the whispering would instead need to be made to the call operator.

    ii.    **The Immigration Consequences of Mr. Santellan's Conviction**

When Mr. Santellan was six years old, his parents immigrated from their native Ecuador to the United States, leaving him and his two sisters behind with their maternal grandparents for two years while they established their new lives and employment in America. PSR at ¶ 34; February 26, 2016 Letter of Margarita Santellan, attached as Exhibit C ("separated for about two years when [our parents] moved permanently to the United States"). The defendant's mother, Nancy Maigua, explains that because of their line of work in Ecuador, she and her husband "spen[t] long periods of time away from [their] children." February 25, 2016 Letter of Nancy

JEFFREY LICHTMAN

Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 5

Maigua, attached as Exhibit D. Wanting to keep their family together in the future, she and her husband moved to the United States for two years to "establish[]" themselves, and then sent for their children from her parents. Id. In the years that followed, the family lived together in Queens, New York. PSR at ¶¶ 32, 37.

Now, despite the fact that virtually all of the defendant's "loved ones" have immigrated to the United States and "his entire life" is here, he will undoubtedly be deported upon completion of his sentence (February 5, 2016 Letter of Rolando Flores, attached as Exhibit E) and an immigration detainer is already in place. PSR at ¶ 35. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ As friend Cristina Pineda explains: "[when] he is deported, he will be forced to start a brand new life in a new place with new people. ... [I]t w[ill] be awfully difficult [for him] to adapt to a new environment so drastically, especially alone." Letter of Cristina Pineda, attached as Exhibit G. Ligia Janeth Cotacachi echoes: "Christopher basically spent his entire life in the USA and to start from scratch in Ecuador will be a challenge, with his mom, dad and two sisters living here. ... [H]e is young and he needs his family['s] support ...." January 20, 2016 Letter of Ligia Janeth Cotacachi, attached as Exhibit H.

Fabian Santillan, the defendant's cousin, explains the deplorable conditions of Ecuador and the difficulties as a member of the indigenous minority that Mr. Santellan will face upon his repatriation: "he ... would suffer terribly. ... In Ecuador (an underdeveloped country) [his] future [will be] uncertain. As a minority, the native community also face[s] discrimination and mistreatment . ... *It will be so hard for him to start a new life in Ecuador, not to mention the lack of job opportunities*." February 20, 2016 Letter of Fabian Santillan, attached as Exhibit I (emphasis supplied). Briana Santillan, who has likewise spent the majority of her life in the United States, explains how she would feel about returning to Ecuador after leaving the country as a young child:

> From a teenager's perspective, who has lived in the U.S. for about [three] quarters of her life, I can truly say that I cannot even imagine going back to Ecuador to start from scratch. Of course, we know the language, Spanish, but how to write a whole essay? Or learn the history from start to current? ... We've dedicated our whole li[ves] to learn[ing] the ways of this country and how to survive in it[.] [Al]though we are very proud of our culture and our roots and even though we are not American born citizens, American culture is embedded in us and this is our home.

February 16, 2016 Letter of Briana Santillan, attached as Exhibit J.

Mr. Santellan's parents will also "suffer" due to the deportation of their son, who works for their Runamaki business selling Ecuadorian crafts at festivals and fairs throughout the Eastern Seaboard. February 10, 2016 Letter of Ramiro Maigua, attached as Exhibit K; PSR at ¶¶ 32, 47. As the representatives from the Kichwa Community of New York (Mr. Santellan's native tribe) explain: Mr. Santellan's deportation "will cause extreme[] []stress ... on his family wh[o] needs his help to maintain a balanced business ... due to the fact that Mr. and Mrs. Santellan are reaching their elderly years." January 30, 2016 Letter of Representatives of the Kichwa Community of New York, attached as Exhibit L. Further, Maritza Santellan informs the Court that her brother's "deportation w[ill] be devastating for [her] family," (February 25, 2016 Letter of Maritza Santellan, attached as Exhibit M) and Diego Tituaña confirms that "deportation ... will impact ... his family ... economic[ally]." February 12, 2016 Letter of Diego Tituaña, attached as Exhibit N.

In addition to the hardships that Mr. Santellan and his family will surely face due to his deportation, while serving his sentence, Mr. Santellan's immigration status will place him in a far worse position than non-alien prisoners. For example, he will not be eligible to serve the final ten percent of his sentence in a halfway house. Instead, he will be immediately transferred to a detention facility at the completion of his sentence to await the outcome of his immigration case, tacking on a significant period of additional incarceration.

While certainly tragic, Mr. Santellan's deportation and its concomitant consequences on both him *and his family* may be considered "mitigating factor[s]" by this Court pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. See, e.g., Brown v. United States, No. 10 Cv. 3012, 2010 WL 5313546, at *1 (E.D.N.Y. December 17, 2010); see also United States v. Sanchez, 433 F. App'x 44, 45 (2d Cir. 2011) (sentencing court correctly reviewed § 3553(a) factors, including "argument that deportation would punish him"). Indeed, the Second Circuit has specifically held that "a district court *may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family*," in determining "what sentence is sufficient, but not greater than necessary, to serve the needs of justice, [pursuant to] 18 U.S.C. § 3553(a)." United States v. Thavaraja, 740 F.3d 253, 262-63 (2d Cir. 2014) (emphasis supplied and internal quotation marks omitted); see e.g., United States v. Chin Chong, 2014 WL 4773978, at *13 (E.D.N.Y. Sept. 24, 2014) ("Critical to the determination of an appropriate sentence is the likelihood that [the] defendant will be deported as a result of his conviction. ... Even without a lengthy term of incarceration, [the] defendant will be ... punished for his wrongdoing by his expulsion from the United States"); United States v. Escolastico, 2011 WL 4448956, at *6 (Sept. 26, 2011) ("In imposing the sentence, the Court considers," *inter alia*, "the fact that [the defendant] will face deportation proceedings following his release from custody").

JEFFREY LICHTMAN

Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 7

Accordingly, Mr. Santellan's deportation the consequences thereof should be considered pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence.

  iii. <u>The Defendant's Obsession with the Victim</u>



  iv. <u>The History and Characteristics of the Defendant</u>

  We have attached nearly 30 character letters in support of this submission, reflecting the significant and meaningful role that Mr. Santellan has played in the lives of family members, friends and others in the Kichwa community. It would be impossible to include a letter from every individual whom Mr. Santellan has positively influenced, and equally daunting to comment on every letter received.[1] Still, the myriad letters on which we do remark paint a consistent picture of a "decent and kindhearted person," (Ltr. of Rolando Flores, Ex. E) with a "strong sense of responsibility," (Ltr. of Ligia Cotacachi, Ex. H) and who is always "the one to lend a hand if needed." February 15, 2016 Letter of Luis Carchi, attached as Exhibit O. Moreover, the attached letters reveal the complete and "absolute shock" experienced by nearly all upon hearing of his

---

[1] Additional letters are collected and attached at the end of this submission as Exhibit Y.

Jeffrey Lichtman
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 8

arrest for a crime seemingly so far outside his character. See, e.g., February 17, 2016 Letter of Karen Saransig, attached as Exhibit. P. Sadly, were it not for this sentencing, many of Mr. Santellan's exceptionally good deeds probably would have gone unrecognized.

<u>A Helpful and Dependable Friend and Brother</u>

Perhaps more than any of his other positive attributes, the attached letters reveal Mr. Santellan's unflagging dependability and helpfulness to friends, members of his family, and others in the Kichwa community. First, several of the submitted letters note Mr. Santellan's assistance in their businesses. For example, Logia Cotacachi writes:

> I am a mother of two kids, an eight-year-old girl and a 14-year-old boy. I have been separated from my husband for about three years. During this time I've worked by myself with my two kids in trade shows, fairs and festivals in different states. In those events more people from our community participate as well and often coincide with each other. *Whenever I would see Christopher's van at the entrance, I would feel such a relief because I knew that I would have [someone] to help me out.*
>
> *Christopher would always lend me a hand because he has a strong sense of responsibility which applies in his job, family and community.* Christopher would help me with the set-up, tear-down and loading. The tent and containers I use are extremely heavy, about 60-80 pounds each. I am ... short and weak ... making the entire process completely exhausting and demanding. Having Christopher in the same show from time to time was a blessing for me and my kids. *He would offer me this help without even asking.* "Janeth, I'm here to help you out" he would say to me. I always felt grateful for this help. After ... this whole thing I asked myself, "[w]ho is going help me now?"

Ex. H (emphasis supplied). Mr. Santellan's sister, Margarita, who ran her own Runamaki operation selling handmade indigenous clothing and crafts at fairs and trade shows also praises the assistance that she received from her brother: "Whenever he had the opportunity, he would come with me to work. ... It was a relief to have him around helping me with the heavy stuff. ... [T]he containers we carry [weigh] around 80-90 kg. ... Chris would not deny me his help whenever I asked for it." Ex. C.

JEFFREY LICHTMAN

Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 9

In addition to praising his help in setting up tents and selling indigenous wares, many of the submitted letters also note Mr. Santellan's assistance during Kichwa community events. Cristina Pineda informs the Court that it is

> astonishing how noble Christopher was on such occasions. He was always there to lend a hand and do the hard duty work portion of the tasks, such as carrying heavy equipment and making sure we weren't putting too much force on things. *It was evident that Christopher helped us out from the kindness of his heart* ... because it was in his moral values to do so ... his presence was always pleasant, and I admired that.

Ex. G (emphasis supplied); see also Ltr. of Luis Carchi, Ex. O (helpful at "native gatherings"). The representatives of the Kichwa Community of New York reiterate this view, writing that he is "considered ... a helpful young man," and that they "have witnessed that [h]e is willing to help anyone in need, especially the women." Ex. L ("help[s] with the heavy work such as moving in and out overweight appliances" when "the elder women of the community organize[] different events").

The leader of the "Indigenous Women" of the Kichwa Community of New York, Martha Santacruz, who is "in charge of some of the activities during [their] holidays and cultural events," echos this praise, recalling: "Anytime I needed somebody to help me out with the organization and heavy work, Christopher w[ould] volunteer immediately and offer a hand." February 15, 2016 Letter of Martha Santacruz, attached as Exhibit Q. And Rodrigo Maldonado, who knows the defendant from "cultural gatherings," has similarly "witnessed" his assistance: "Christopher would help during the move in and out of the appliances needed for the events. [He] would volunteer and help me out to set up the sound system for our ... event [as well]." January 11, 2016 Letter of Rodrigo Maldonado, attached as Exhibit R.

The pile of letters praising Mr. Santellan's helpful nature continues beyond those just discussing his aid during community events and fairs. Juan Pablo Vera, Mr. Santellan's soccer coach, notes that he was a "very reliable young man that was always willing to help everyone on the team in any way ... he could." February 10, 2016 Letter of Juan Pablo Vera, attached as Exhibit S. Further, Margarita Santellan recalls for the Court that as her brother "grew up, he became more responsible and had the need to take care of women in [his] house. He would help ... with the laundry bag, carrying the shopping bags [and] cleaning up." Ex. C. Similarly, Briana Santillan informs the Court of a time when Mr. Santellan came to her aid when in need:

> There was this one time that for personal reasons I was stranded by some peers far away from home early in the morning; at that

JEFFREY LICHTMAN

Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 10

> moment I needed someone to come get me and as reliable as he is, he came for me. He was discreet about the whole situation, as I needed him to be for my safety and from then on more so than I ever knew *he was someone who would have my back at any time*.

Ex. J (emphasis supplied); see also January 30, 2016 Letter of Luis Cando, attached as Exhibit T ("ready to give a helping hand to others [at] any time").

In addition to coming to the aid of others, physically, Mr. Santellan has been there for friends and family in need of emotional support and guidance. Rolando Flores recalls that

> [e]ven though there is a great age difference between us, [Christopher] respectfully gave me his advice when I told him about a personal problem I was dealing with at the time. *[It] really helped me to ease my mind and [m]ake the right decision.* It was gratifying to listen to his wise advice. I do not see that very often.

Ex. E (emphasis supplied). Similarly, Bryan Santillan praises the "advice[]" that he received from the defendant:

> my cousin impacted my life in many ways but the one I will remember for the rest of my life is when he told me to end a destructive relationship I had with a young girl. I will thank him all my life because at the end I realize[d] that Christopher's words were all true. I am glad I closed that chapter of my life. *I couldn't have done it without his help.*

February 12, 2016 Letter of Bryan Santillan, attached as Exhibit U (emphasis supplied); see also Ltr. of Luis Carchi, Ex. O ("the one [to] encourag[e] others to a positive outcome").

Margarita Santellan informs the Court of a time when her brother's support was critical – when she was working on her thesis and needed his help with her personal affairs:

> I was having the most stressful time of my life. I thank my brother for being there for me during this period. Since I was a little late, I decided to focus only on my thesis leaving significant and small responsibilities to the side. During one month[,] I did nothing but sit[] in front of the computer. While I was working on the thesis, Chris would drop off and pick up my daughter from school, take her to extracurricular activities, help her with her homework and

> play with her. It was a big help! My brother even helped me to gather research for my thesis so I c[ould] process it [for] use ... on my topic. ... I will always be thankful for [him] being such a good brother.

Ex. C. Further, Mr. Santellan "played a significant role," in the academic "success" of his niece, Margarita's daughter. Id. His sister explains:

> I signed up my daughter for the NYC [g]ifted and [t]alented [t]est, and I could not enroll her in the preparation program because it was too costly. My brother helped [her] prepar[e] for the test and tutor[ed] her on [the] weekends. *Thanks to his dedication ... my daughter passed the test [and scored in the] 99th percentile.* Now [she] goes to an outstanding school with better opportunities.

Id. (emphasis supplied).

Integral to his Family's Business

Given Mr. Santellan's dedicated and hardworking nature, it is perhaps unsurprising that he became extremely involved in his family's business when his father was no longer able to hold the "reins" on his own. See Ltr. of Martha Santacruz, Ex. Q; February 3, 2016 Letter of Alfonso Santillan, attached as Exhibit V ("Christopher decided to take on the family business mainly because [his father] was reaching his senior years"). Margarita Santellan explains:

> Little by little, [Chris] became involved in the family business and was able to manage school, work and sports. During the time we spent together, *he told me that it was hard for him to keep up with all the activities, but he wanted to help my dad.* ... My parents are getting old, and Chris was aware that they would not be able to work with the same energy anymore.

> When Christopher graduated from high school, he was already involved in the business 100%. He started to do all the work that the company demanded. *My brother w[ould] do all the tough and stressful work by himself keeping in mind that he needed to establish the business and make it easier for mom and dad.* ... Christopher would wake up very early in the morning and drive for hours in order to get to work. After that, he would set up the big 20 f[oot] tent and exhibit the merchandise. When the show started,

JEFFREY LICHTMAN
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 12

> Chris would sell the merchandise until very late at night. He would have the same routine for the duration of the festivals which usually run from three days to two weeks.

Ex. C (emphasis supplied); see also Ltr. of Maritza Santellan, Ex. M ("My dad loved having him around because ... it meant more help for him; at ... 50, he doesn't have the same strength he used to have").

Nancy Maigua, the defendant's mother, confirms her daughter's take on his role in the family business:

> Since Christopher was a child he would help my husband with the family business, as he grew older he became the right hand of our company. For the last two years, he has been in charge of the most difficult side of the business, which consists of long trips, months of planning and extremely laborious assignments. During the shows, my son never let me do any of the heavy lifting, he was always worried about me getting injured.

Ex. D; see also Ltr. of Luis Carchi, Ex. O ("Work wise[,] he was always there to help out his family"); Ltr. of Ramiro Maigua, Ex. K ("Since his young years, Christopher has helped in the family business").

Clearly, Mr. Santellan's help in his family's business has not gone unnoticed. Luis Cando informs the Court that he has "seen how [he] helps his father .... Christopher was always in charge of the heavy work, long trips, merchandise loading/unloading, and out of state shipping." Ex. T. Likewise, Richard Maigua writes: "I have seen his enthusiasm to help his parents. Christopher has always been good with customer service; ready to satisfy every need. ... [H]is father [would] speak to me about how proud he was knowing that Christopher was ready to take on the great responsibility of the family business." Letter of Richard Maigua, attached as Exhibit W. And the representatives of the New York Kichwa Community echo: "Most of the members in the community [who work in the] same [type of] business ... have seen him helping his dad, mom or sisters in the events they participate in. ... Christopher is in charge of long trips the business demands as well as the logistics and weighty work." Ex. L.

<u>Shock</u>

Also among the recurring themes found in the submitted letters is the shock experienced by friends and family upon learning that Mr. Santellan had been arrested, especially for a crime that appeared "very unlike him." See Ltr. of Margarita Santellan, Ex. C ("very hard for me to

JEFFREY LICHTMAN
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 13

understand that he committed a serious crime"). Friend Rodrigo Maldonado informs the Court that "[i]t shocked [him] when [he] found out that [Santellan] was arrested and charged with kidnapping," (Ex. R) and Luis Cando notes that it "took [him] by surprise ...." Ex. T. Similarly, Rolando Flores explains that the "last thing [he] would have thought of is finding out that Christopher [was] behind bars," as he "always pictured him as a successful young man." Ex. E; see also Ltr. of Ramiro Maigua, Ex. K ("Harming someone is not part of his personality").

Indeed, as the letters reveal, the crime to which Mr. Santellan pleaded guilty and his "irrational behavior" appears far outside his normal character. See Ltr. of Nancy Maigua. Ex. D. Bryan Santillan explains:

> Growing up with Christopher was a pleasure. I can say from the bottom of my heart that out of everyone I know he was the last one to come to my mind to get arrested. I still can['t] figure it out. After all the advice[] he gave to manage my personal life[,] it is hard to believe this happened to him.

Ex. U. Further, Karen Saransig writes that it was "the absolute shock [of] the world," and that she was "even more puzzled" upon learning the details of the charges. Ex. P. And the defendant's former soccer coach, Juan Vera, confirms that he "has never shown any signs that he would ever in his life step inside a prison." Ex. S; see also February 11, 2016 Letter of Tupac Lema, attached as Exhibit X ("never a violent person ... never seen [with] bad habits. ... never showed any behavior that would head him to his imprisonment"); Ltr. of Kichwa Community Representatives, Ex. L ("we have never seen or experienced any type of erratic[] behavior ....").

Remorse

Finally, several of the submitted letters note the sincere regret that Mr. Santellan has expressed concerning his criminal conduct. For example, Ligia Cotacachi informs: "While Christopher was at home [on] bail, I had a chance to talk to him about his situation. Christopher knew that his behavior was not like him at all. He regretted [it] and said that he wants to keep [moving] forward ...." Ex. H. Similarly, Cristina Pineda explains: "When Christopher was out of jail on [bail] ... I got the opportunity to have a few words with him. We conversed ... he knew he made mistakes and *you could see [his] remorse* ...." Ex. G (emphasis supplied); see also Ltr. of Fabian Santillan, Ex. I ("Christopher recognizes the pain he has caused ....").

JEFFREY LICHTMAN
Hon. Denise L. Cote
United States District Judge
March 18, 2016
Page 14

### E. CONCLUSION

Defendant Christopher Santellan comes before this Court asking for mercy. A life just starting has been destroyed by criminal actions, brought on by his jealously and obsession with a former girlfriend for whom he truly cared. Nevertheless, as the powerful enclosed letters reveal, Mr. Santellan is an uncommonly decent and giving young man, and unlike many defendants, has made very sincere efforts to help family and friends in any way possible throughout his life. For these reasons and the others stated herein, a lenient sentence is respectfully requested.

Respectfully submitted,

Jeffrey Lichtman

cc: Frank Balsamello, Esq.
Assistant United States Attorney (by mail and ECF)